Who is Gordon, on behalf of Petitioner Ahmed Abulfeilat. May it please the Court. Your Honours, this case is about a BIA denial of a motion to reopen. I believe the Board has abused discretion in failing to reopen the case. The evidence which was submitted in this case is quite substantial, and it's not only in one area. There were three expert affidavits in support of the Petitioner's motion to reopen. There was substantial documentary evidence, including evidence of converts to Christianity who had been The substantial evidence submitted to in connection with the prior case which came up here, and we've ruled on that. Can you focus on the differences, the qualitative differences in the evidence presented in connection with the motion to reopen? So the motion to reopen contains evidence of new State Department reports, and there is a qualitative difference in that the threat of mental and physical abuse by their families and government officials, and at times community members, is different than what was stated in the prior reports that were done. The latest, I think, was 2002 in the case. How did they, for example, apply to this particular Petitioner? They, for example, talk about honour killings. Well, that's almost entirely respecting women. This is a man, not a woman, right? How does that have anything to do? That's correct, Your Honor. Okay, so I believe that there is a substantial relation to this case. The Petitioner has brought dishonour to his family by, earlier on, revealing the names of relatives. Honour killings don't only apply to women. In fact, as I noted in the briefing, there's a First Circuit case that discussed that issue. I guess what I struggle with in this case, Counsel, as my colleague has mentioned, this case has been before us before. Yes, Your Honor. We've considered it and denied it. You're saying something has changed. So let me raise this point. The Board, in its decision, says that the evidence that they're denying is substantially similar to the evidence that this Court denied before. But this Court denied a substantial evidence standard. The Board wasn't supposed to be reviewing this evidence under a substantial evidence standard. That's number one. And it's substantially different in that, from 2002 until when this motion was filed, there's been tremendous changes in the Middle East. And there is evidence in the record from one of the experts who notes that Christians have been killed, converts have been killed. We didn't have that evidence, per se. Is that the way we're supposed to judge these things, is to have cherry-pick examples of horrendous, admittedly, horrendous things that have happened to converts? Can you cherry-pick that from newspapers and other things and then say, this is what's going to happen to my client? Is that what the standard is? Well, Your Honor, I don't think we're cherry-picking, per se. That may be the wrong term, but the reality is what I see is you've taken incidences that have been reported in newspapers and magazines and said, look at this. And it is awful. I grant you all of that. But I fail to see how that ties to your particular client situation. It's been 10 years since the earlier case, roughly. And you're saying you've got to reopen this because things have changed. And my question is, as to your client, how have things changed? What is new here that was not known before? Maybe the volume, maybe different countries. But the reality is you've shown nothing about what the state of Jordan, the Kingdom of Jordan, has done. Indeed, they've been pretty good in trying to protect people who are apostates from the Islamic religion. I just don't see anything new. Help me with that. What am I missing? Could you, in your answers, please focus? It would help me if you'd focus on what evidence there is that whatever your client's risk are, the Jordanian government would acquiesce in it? Well, the Jordanian government, and there is evidence in the record, the experts have said this, that the Jordanian government at times tells families that people have converted, which increases or gets those family members to undertake these killings. And there is a letter from the respondent's niece that's in the record who recently was in Jordan. I think that is a new letter. It's new evidence. And she says knowing the conservative religious nature of the family, she can assume that there will be adverse consequences for the petitioner if he returns to Jordan. And she doesn't see why members of the family will not harm him physically. But it's all conjecture. And, again, when you answer these questions, you're saying that something's going to happen with the acquiescence of the government, and you're saying, well, they tip off the family. Is that it? The government will tip off the family. And I quote from the record that … You don't think the family already knows this? I think that the family knows it. But when he arrives in Jordan, what she's confirming based on her recent visit to Jordan is that she believes that this is an issue that's going to happen. Okay. So I think we're all struggling. There are incidents in the record of his niece's declaration. But the question is, is it with the acquiescence of the Jordanian government? Yeah, if people come to the United States, they could be subjected to danger on the streets. The question is, do the authorities tolerate it? Do they acquiesce in it? So that was the second prong of what the BIA decided. And so I'm trying to get you to focus on that. Okay. So there's a case that's in the record at page 267 to 270 of a gentleman named Mohammed Abad, who was in court for apostasy. And the judge in that case taunted him. The attackers were ultimately dismissed. Well, the Jordanian government is not doing anything to stop this. They know about it. Apostasy is — Counsel, you're just talking in circles. We need some specifics. Abad doesn't really apply here. We don't know the facts of the case. We don't know why these other folks were let off. We have instances in our court system where the government simply hasn't proven its case, and we reverse the case. But you don't have instances where the judge taunts the defendant for converting. You haven't been to some of our courtrooms. Do you want to save any of your time, by the way? Yes, I do, Your Honor. Let me save a little time. Okay, very good. We'll hear from the government. May it please the Court, Your Honors. Tim Remnitz on behalf of the United States Attorney General Loretta E. Lynch. This immigration case, Petitioner, Native, and Citizen of Jordan, seeks review of the fourth decision of the Board of Immigration Appeals in this case, which it denied his untimely motion to reopen, where he claimed changed country conditions, materially changed country conditions, justified reopening the application for deferral of removal under the Convention Against Torture or CAP. In his motion, he claimed, as he did in 2001 before the immigration judge, that he experienced torture in Jordan because he converted to Islam from Christianity in 1990, and also because he made it known to U.S. officials that his family had criminal involvement in his criminal conviction for conspiracy to defraud the United States. When this court first addressed that claim, it noted in its unpublished decision in 2013, where it affirmed the agency's denial of deferral of removal, that while apostasy is punishable by death under Islamic law, and while there is societal discrimination against converts in Jordan, there was nonetheless no clear probability of torture by or with the acquiescence of the Jordanian government. And that was under the substantial evidence standard of review, as Petitioner stated. The standard of review in this case is more strict, actually. It's abuse of discretion, because it's a motion to reopen with its interest in finality. Under abuse of discretion standard, the board's decision has to be arbitrary or capricious, devoid of reason, essentially. And when you look at these documents Petitioner submitted, we'll go through them, and you'll see it's certainly not an arbitrary, capricious decision, because nothing has materially changed in Jordan since the prior 2001 proceedings. First, some of these documents don't pertain to someone similarly situated to Petitioner. This was noted somewhat in Petitioner's argument. Some pertain to the country of Syria, which of course is not relevant to this Jordan petitioner. Some pertain to honor killings of women, and others pertain to anti-regime protests in the wake of the Arab Spring. None of these are essentially relevant to this petition for review. What Petitioner focuses on are these three expert reports. And if we go through them, we're going to see that nothing has materially changed in the fact that, one, these expert reports report over and over again that when there is Sharia law involved in Jordan, it's only a matter of family law judgments. It's not a criminal conviction. There are no criminal proceedings for apostasy in Jordan. It's only family law judgments that can issue. The courts do not have authority to impose criminal punishments or criminal sentencing. And you're also going to see that the Jordanian government does not acquiesce when there has been abuse of converts. Is your point that, insofar as apostasy is concerned, that that would not be acquiescence of the Jordanian government, but rather would be an Islamic religion? These are Islamic religious courts. But does the government take any action if the families or the Islamic Sharia courts impose torture? That's the issue, isn't it? That could be an issue. However, there's no evidence in any of these documents that a Sharia court has ever imposed torture on an individual. What if it's fully predictable that the families will inflict torture-level pain and suffering on this man if he goes back? Is there evidence that the Jordanian authorities will acquiesce in that? No, there's no evidence of that. And that would be outside of Sharia courts anyway. That would be a family taking it upon itself to punish someone or abuse them because of their conversion to Christianity. I just want to make clear what your position is. Let's suppose it was quite clear that this person went back. Let's suppose it was a woman and would go back. And they wouldn't kill her, but they would, in effect, torture her in some fashion because she had married a non-Muslim. Would the Jordanian government say, That's fine. It's a matter of the family. The family can take that out. It's short of an honor killing. So there's no, still in the United States, would be battery, severe battery. I suppose they do it to him. Does the Jordanian government tolerate that? There's no evidence in this record that the Jordanian government would acquiesce to that. Even an example of an honor killing of a woman, which is cited in Paul Marshall's report, in that article, which is submitted also by petitioner, the Jordanian authorities arrested the father that committed the honor killing in that case. And when you say, counsel, that there's no evidence in the record that the government would acquiesce to that, are you talking about the lack of evidence that reports to the government or to officials would be unaddressed? Or is there any evidence in the record that if a victim goes to the authorities, that the authorities would fail to take action to stop the persecution? No. And let's start with the example petitioner focused on. I can't remember the gentleman's name, but it's an article in the record, 2008 incident, where that man harbored a Christian convert. He was a Christian convert himself. He'd had him for 15 years without incident. And then he harbored another Christian convert, and the family of that Christian convert beat him up. And the article clearly states on page 267 of the record that he filed the police report, and the police took his report. However, his father then went to Sharia court to get family law judgments. At that point, he fled the country. So anything in that article, in the end of that article, it notes apostasy is not a criminal offense. Even in that article, he filed a police report, and the police took his report. And we go through this over and over again through the documents. We'll see whether there has been police protection sought. The police have taken reports or even provided protection. There's a 2009 refugee tribunal document petitioner submitted. In that case, it gives an example where someone who's had an apostasy charge filed against them in Sharia court for this family law judgment, which is custody determinations, annulments of marriages, and inheritance rights. That's what the Sharia courts do in Jordan. And even in that instance, he sought police protection, and it states that the police protected him and hid him from his family. And this is not dissimilar from what was before this court and the immigration judge of 2001. There is an article petitioner submitted with his first round at seeking deferral to move on to the CAT. An article at page 1680, the person in the article, the Christian person, states, unlike other Arab countries, we Christians in Jordan. I think it's Arab, not Arab. Arab, excuse me. While other Arab countries do not enjoy the protection of their government for Christians, we Jordan Christians do have the protection of our government. Nothing has changed, materially changed, since that statement was made and produced in 2001. And you see Paul Marshall goes through these four examples, and the one example petitioner cited, you saw the police report filed. And then there's other examples Paul Marshall cites. One's an honor killing of a woman, where the father was arrested afterwards. And there was another example where the petitioner was, again, taken through family law and had these family judgments imposed upon him, and he was threatened by his family. But there's nothing in that article that discusses him going to the police or seeking police protection. So what we have in the rest of the article is when he did seek police protection, the police offered that protection. So basically there's, number one, from the government's perspective, there's nothing new. No new evidence. What is produced does not show that the Jordanian government acquiesces in basically going after people who have apostatized from Islam. Correct. Does Paul have any further questions? Any other colleagues? I think not. Thank you very much, counsel. You have a little bit of time for a rebuttal, if you wish. Would you also address your motion to seal any decision we make in this case? Okay. Yes, Your Honor, I would request that the case be sealed. Why is that? We've already published two opinions. What is it that's? Well, if the petitioner is removed to Jordan, the less information that's available about him and about his case on the Internet would be better for his protection. What kind of information would be, in our opinion, that would be of trouble to him? Reiterating his conversion would not be helpful to him. I wanted to note that Professor Gabai, who is of Israeli background, had noted that it's more likely than not that Mr. Abufailat would face a criminal conviction for his religious conversion, sentenced to prison where he would face severe physical abuse and torture in the Jordanian prison system. Now, addressing counsel's argument that. . . Counsel, I'm afraid you're out of time. We thank you for your argument, and the case just argued is submitted. Okay. Thank you very much.
judges: Fisher, M. Smith, Nguyen